Mary Sinclair v. Commissioner. George Abbott v. Commissioner.
Sinclair v. Commissioner
Docket Nos. 68220, 68358.
United States Tax Court
T.C. Memo 1960-113; 1960 Tax Ct. Memo LEXIS 178; 19 T.C.M. (CCH) 602; T.C.M. (RIA) 60113; May 31, 1960
*178 Arnold R. Krakower, Esq., and Richard Steel, Esq., for the petitioner in Docket No. 68220. Joseph B. Kass, C.P.A., 200 Fourth Avenue, New York, N. Y., Max W. Schachter, Esq., and George G. Gallantz, Esq., for the petitioner in Docket No. 68358. John A. Dunkel, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in income tax for petitioner Mary Sinclair for the year 1951 in the amount of $4,500.48. Respondent determined a deficiency in income tax for petitioner George Abbott for the year 1951 in the amount of $4,472.39. The two cases were consolidated for trial because the only remaining issue in both cases involves the same transaction, all other issues having been disposed of by agreement between respondent and the individual petitioners. The only issue is whether the sum of $5,600 allegedly paid by Abbott to Sinclair in the year 1951 was compensation to Sinclair in the form of a commission for obtaining for Abbott the right to produce as a play "A Tree Grows in Brooklyn" and is therefore taxable as ordinary income to Sinclair and deductible as an ordinary and necessary business expense *179 by Abbott. Abbott claimed the $5,600 as a deduction on his return, and Sinclair did not include it as taxable income on her return. In his notices of deficiency to the two petitioners, respondent disallowed the deduction to Abbott and included the $5,600 as taxable income to Sinclair. At the trial and subsequent thereto, respondent has taken the position that he is merely a stakeholder, and if the $5,600 was paid by Abbott to Sinclair as compensation for services rendered, it should be deductible by Abbott and taxable to Sinclair, and conversely, if the $5,600 was not paid by Abbott to Sinclair as compensation for services rendered, it should not be included in the income of Sinclair and should not be deductible by Abbott. Respondent did not file a brief but advised the Court, subsequent to the trial, that he would not rely on a failure of one or both petitioners to carry the burden of proof in order to both disallow the deduction to Abbott and include the amount in taxable income of Sinclair, but would rely on the Court's decision to determine which petitioner should bear the burden of the tax. Findings of Fact Petitioner Sinclair was a resident of New York City and filed her *180 individual income tax return for the calendar year 1951 with the district director of internal revenue for the upper Manhattan district of New York. Petitioner Abbott, an individual residing at Port Washington, Long Island, New York, filed his individual income tax return for the calendar year 1951 with the district director of internal revenue for the first district of New York. Abbott, who for many years has been in the theater business as an actor, author, director and producer of Broadway plays, and Sinclair, who has also been closely associated with the theater in New York, principally as a television actress, were married in 1946. They separated about 2 years after their marriage and established separate residences. Sometime in the latter part of 1950 or early in the year 1951 and until sometime in April or May 1951, petitioners again lived together in an apartment in New York City, although Abbott retained his residence on Long Island. Petitioners were formally divorced in August 1951. No formal separation agreement was executed by petitioners when they first separated. However, Abbott agreed to pay Sinclair a living allowance of $1,000 per month. During the period from *181 December 1949 to June 1, 1950, the following checks were drawn on either the personal or office account of Abbott payable to Mary Sinclair: Date
Amount
12/ 1/49
$1,000
1/ 2/50
1,000
2/ 1/50
700
3/ 1/50
700
3/ 7/50
500
4/ 1/50
395
4/11/50
500
5/ 1/50
500 During this period, in addition to the above checks, Abbott drew a check payable to Prettyman & Co. dated January 30, 1950 in the amount of $105, presumably in payment of an account for Sinclair. With the exception of the last-mentioned check, all of the above checks were personally endorsed by Sinclair and deposited to her account in the Corn Exchange Bank in New York City. During the period June 1, 1950 to December 31, 1950, the following checks were drawn on either the personal or office account of Abbott payable to Mary Sinclair: Date
Amount
6/ 1/50
$1,000.00 *
6/ 5/50
1,000.00
7/ 6/50
1,000.00
7/10/50
1,000.00
7/31/50
2,000.00
8/21/50
2,000.00
9/ 6/50
2,000.00
10/ 3/50
1,000.00
10/ 5/50
1,000.00
11/ 1/50
1,048.44
11/ 1/50
2,000.00
11/ 6/50
1,000.00
12/ 8/50
1,000.00
*182 All of the above checks were endorsed "Mary Sinclair," "Mary Abbott," and/or "Mrs. George Abbott" by Abbott's secretary, and deposited in an account opened in the name of "Mrs. Mary Abbott, 565 Park Avenue, New York," at the Chemical Bank & Trust Company in New York City. During the period January 1, 1951 to August 2, 1951, the following checks were drawn on either the personal or office account of Abbott payable to Mary Sinclair: Date
Amount
1/11/51
$ 492
1/16/51
2,000 [1]
3/ 1/51
1,000
3/14/51
600 [1]
3/23/51
1,000 [1]
4/30/51
1,000 [1]
6/ 1/51
1,000 *
6/27/51
1,000
7/ 2/51
1,000
7/16/51
1,000
8/ 1/51
1,000
All of the above checks except the check dated January 11, 1951 in the amount of $492 were endorsed "Mary Sinclair" and/or "Mrs. Mary Abbott" by Abbott's secretary and deposited in the account standing *183 in the name of "Mrs. Mary Abbott, 565 Park Avenue, New York," in the Chemical Bank & Trust Company of New York. The check for $492 was endorsed by Sinclair and deposited or cashed at the Chemical Bank & Trust Company. In addition to the above checks, Abbott drew a check dated January 30, 1951 in the amount of $1,000 payable to Julia Trissell, with whom Sinclair shared an apartment during her original separation from Abbott. [1]
During the period of their separation, Abbott also bought gifts for Sinclair, and between December 1950 and June 14, 1951 drew five checks totaling approximately $12,000 payable to W. & J. Sloane for furnishings for the apartment shared by Abbott and Sinclair at 565 Park Avenue. The bank account in the name of "Mrs. Mary Abbott" at the Chemical Bank & Trust Company was opened May 23, 1950. The bank's "Memorandum of New Account" indicated that the name "Mary Sinclair" would also be used, and that the account was affiliated with George Abbott's accounts. The bank's file on this account also contained copies of several letters from the *184 bank addressed to "Mrs. Mary Abbott, 565 Park Avenue, New York," acknowledging the opening and closing of the account and calling attention to an overdraft. The account was closed October 10, 1951. The bank's files contained no replies to the above letters. The average balance in the account from the time it was opened and was closed was between $700 and $1,000 per month. Except for miscellaneous records which supplied the above information, all of the bank's records on this account had been destroyed at the time of the trial and it was impossible to determine definitely from the bank's records at the time of the trial who was authorized to draw checks on this account, who had actually drawn checks on this account, or the total amount of deposits therein and withdrawals therefrom. Sometime during the latter part of 1950 or the early part of 1951, Sinclair suggested to Abbott that through her acquaintance with a man named Fryer, who had the production rights to the story, "A Tree Grows in Brooklyn." she might be able to obtain for Abbott the right to produce this play on Broadway. Abbott thought it was a good idea, and Sinclair did obtain for Abbott the right to produce the play. *185 Abbott did produce the play and it ran on Broadway from April to December 1951. After she obtained the production rights for Abbott, Sinclair at times mentioned to Abbott that she thought she was entitled to a "piece" of the show. After rehearsals of the play had begun and sometime during the spring of 1951 Sinclair took a trip to Europe. Sometime in May 1951, Abbott prepared a predated letter in the following form and took it to Sinclair at the apartment: "January 16, 1951 "Dear Mary: "This is to confirm our agreement that you are to receive Five thousand six hundred ($5600) Dollars for your efforts in getting Robert Fryer to bring me the script of A TREE GROWS IN BROOKLYN. "This is to constitute payment in full for your services in that matter. /s/ George Abbott "Miss Mary Sinclair, 565 Park Avenue, New York, N. Y.
"ACCEPTED: "/s/ Mary Sinclair" This letter was signed by both Abbott and Sinclair as indicated. By letter dated March 11, 1952, Abbott wrote to Sinclair, who was then in California, as follows: "Your Mr. Strauss says you have no memory of making a deal with me to receive a commission on A TREE GROWS IN BROOKLYN. I cannot believe that he has made *186 it clear what this is all about. You must certainly recall that you talked many times about your not receiving compensation for that service - about the fact that Mrs. Hayward had a piece of the show and you didn't, and that I finally agreed to pay you this commission and brought the agreement up to your apartment which you signed, and a copy of which I herewith include. You must remember, furthermore, that on our very last meeting I said to you, "You made more money out of A TREE GROWS IN BROOKLYN than anyone else", and you said, "Yes, I paid for my Paris trip out of this." "I think you must recall these incidents, and I think you ought to call your tax man and tell him that you do. His statement to us is that you have never received any money, and never signed any agreement. "I am sorry that money has to become such a disagreeable thing between us." Abbott filed with the Internal Revenue Service T.D. Form 1096, an annual information return, for the year 1951, attached to which was T.D. Form 1099, indicating payments made by Abbott during the year 1951 to Mary Sinciair in the amount of $5,600 in the form of "salaries, fees, commissions, or other compensation," and another amount *187 of $4,200 in the form of "annuities, pensions, alimony, and other fixed or determinable income." Petitioners Abbott and Sinclair filed a joint income tax return for each of the calendar years 1949 and 1950. They filed separate income tax returns for the year 1951. On his return for the year 1951, Abbott claimed a deduction for "commissions paid to agents" in the amount of $6,478.85, included in which was the $5,600 here involved. Sinclair did not include in income on her 1951 return the $5,600 here involved. The amounts deposited in the account in the name of "Mrs. Mary Abbott" at the Chemical Bank & Trust Company were withdrawn by or were available to Sinclair, including the amounts represented by the four checks mentioned above totaling $4,600. The check dated January 30, 1951 drawn by Abbott payable to Julia Trissell in the amount of $1,000 was payment for a Magnavox or other furnishings owned jointly by Sinclair and Trissell and moved by Sinclair to the apartment occupied by Sinclair and Abbott in early 1951. $2,600 was a reasonable fee for the services rendered by Sinclair to Abbott in obtaining for him the production rights for "A Tree Grows in Brooklyn." Opinion We are *188 hampered here by the lack of specific evidence on the details of the transactions between petitioners and the times they took place. Both petitioners testified that they were separated and then began living together again, but neither of them testified specifically with respect to the time they resumed living together or when this relationship terminated. Abbott also testified that the checks totaling $4,600 drawn payable to Sinclair, between January 1 and June 1, 1951, and deposited to the account in her name at the Chemical Bank & Trust Company all constituted loans to her but gave no details with respect to any of them, while Sinclair denied ever having received the proceeds of same. It is also unfortunate that the bank records of this account were not preserved, and we find it difficult to understand why the parties made no effort to have them preserved when the tax question was actively considered by them in March 1952 while the records were still available. However, in view of the position taken by respondent, we will try to read between the lines to determine what actually happened. It seems clear that the account in the name of "Mrs. Mary Abbott" at the Chemical Bank & Trust *189 Company was an account opened for the purpose of making the monthly payments from Abbott to Sinclair and that she withdrew the funds deposited therein. While she may not have deposited her own funds in this account and therefore did not consider it as her account, nevertheless, the pattern developed by the evidence indicates without much question that this was the account from which she obtained her monthly allowances after May 1950. Up to May 1, 1950, Abbott's monthly allowance checks were sent directly to Sinclair and were endorsed by her and deposited in her account at the Corn Exchange Bank, but when an account was opened in her name at the Chemical Bank on May 23, 1950, all payments thereafter made to her by Abbott, with one exception, were endorsed by Abbott's secretary and deposited to the account in her name in the Chemical Bank. Sinclair did not deny receiving the specified monthly payments from Abbott, and it is only logical to assume that after the first of June 1950, she received her payments through the Chemical Bank and drew her living expenses from this account. While it is possible that someone had a power of attorney to draw funds from this account in her name, there *190 is no evidence that there was such a power of attorney, and it also seems probable that the bank account "memorandum cards" which are in evidence and which indicate that checks could be drawn from this account in the names of either Mary Abbott or Mary Sinclair would also have noted thereon anything which would have given anyone else power to draw on this account. We have, therefore, found as a fact that amounts deposited to this account were withdrawn by Sinclair. The next question is whether the $5,600 in question, or any part thereof, qualifies as a payment of compensation for services rendered by Sinclair to Abbott in connection with his business so as to be deductible by Abbott as an ordinary and necessary business expense and taxable to Sinclair as income. There is no claim that at the time the payments were made they were paid as compensation for services. They were loans, advances, or gifts by a husband to cover his wife's personal living expenses. Nevertheless, both Sinclair and Abbott testified that she asked for and was entitled to some compensation in the form of a finder's fee, and the evidence indicates that she voluntarily signed the agreement of January 16, 1951, agreeing *191 to accept an amount Abbott claimed she owed him as compensation in full for that service. However, it is also clear that the amount stated in the agreement bore no relationship to the value of the services rendered but was simply the amount Abbott considered she woed him at that time which he would probably be unable to collect in any event. While there may be some question that any payment by Abbott to Sinclair under the circumstances would be considered a necessary expense of his business, because of the relationship between them, and the fact that he apparently obtained the production rights before any definite agreement was made about a finder's fee, the evidence does indicate that there was some discussion of the subject between them prior to the time she obtained the production rights for him. Had an amount been agreed upon in advance and had it been a reasonable amount for the services rendered, we think the payment thereof by Abbott to Sinclair would have been an ordinary and necessary expense of his business and income to Sinclair. There is very little evidence before us on what would be considered a reasonable fee for these services. Both parties testified that such a *192 finder's fee usually takes the form of a percentage interest in the play. Abbott testified that $5,600 was a reasonable fee for this service but admitted that it was used because that was the amount previously loaned to Sinclair, and his letter to Sinclair in March 1952 indicates that $5,600 was considerably more than she would have realized had she received a "piece" of the show rather than a lump-sum fee. Sinclair testified that $5,600 was more than she would have expected to be paid before a show was even put into production, and that she would have felt that $3,000 would have been adequate compensation even had it been in the form of a percentage fee. In view of the above evidence, the fact that Abbott and Sinclair were husband and wife apparently living together when these payments were made and Abbott was obligated to support Sinclair at the time regardless of what agreements they had made when they separated and regardless of what advances he had made to her under that agreement in the past, the fact that the $1,000 payment to Julia Trissell appears to have been for a Magnavox for use in the apartment occupied jointly by Abbott and Sinclair rather than a loan to Sinclair, *193 and in the light of all the evidence presented, we have found as a fact that $2,600 was a reasonable finder's fee for the services rendered by Sinclair to Abbott. We conclude that $2,600 is deductible by Abbott as an ordinary and necessary business expense in the year 1951 and is taxable as ordinary income to Sinclair in that year. The balance of the $5,600 in question constituted gifts or personal living expenses of Abbott and is neither deductible by him nor taxable to Sinclair. Decisions will be entered under Rule 50. Footnotes
*. This particular check does not bear on its reverse side a bank stamp, as do all of the other checks, but as in the case of the others, a cancellation date has been punched through by the bank.↩
1. The four checks to Sinclair indicated above, plus the check to Trissell, make up the total $5,600 here involved.↩
*. This check was actually dated 6/1/50, but since it was canceled on 6/6/51 and since there is another check dated 6/1/50 and canceled 6/5/50, we presume the above check was drawn on and intended to be dated 6/1/51. ↩
1. The four checks to Sinclair indicated above, plus the check to Trissell, make up the total $5,600 here involved.↩